Of Counsel:
DAMON KEY LEONG KUPCHAK HASTERT
Attorneys at Law
A Law Corporation

GREGORY W. KUGLE 6502-0
gwk@hawaiilawyer.com
TOREN K. YAMAMOTO 11520-0
tky@hawaiilawyer.com
1003 Bishop Street, Suite 1600
Honolulu, HI 96813
www.hawaiilawyer.com
Telephone: (808) 531-8031
Facsimile: (808) 533-2242

Attorneys for Plaintiff
Lukasz Gottwald

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| LUKASZ GOTTWALD ,<br><br>Plaintiff,<br><br>vs.<br><br>CK ROOFING & PAINTING LLC, KEITH CHUL KYU LEE, and JASON CORNELIO,<br><br>Defendants. | CIVIL NO.<br>(Construction Defect)<br><br>**COMPLAINT; EXHIBITS “1”–“4”; SUMMONS** |

## COMPLAINT

Plaintiff LUKASZ GOTTWALD (the “**Plaintiff**”), by and through his attorneys, Damon Key Leong Kupchak and Hastert, and for their complaint

("**Complaint**") against Defendants CK ROOFING & PAINTING LLC, also known as CK Roofing Company ("**CK**"), KEITH CHUN KYU LEE ("**Lee**") and JASON CORNELIO ("**Cornelio**"), and, collectively with CK and Lee, the "**Contractor**") allege and aver as follows:

## PARTIES

1. Plaintiff is a resident of Los Angeles, California.

2. Defendant CK is a Hawai'i limited liability company with its principal place of business in Hawai'i.

3. According to records of the Hawai'i Department of Commerce and Consumer Affairs, the members of CK are Lee and Cornelio, who, upon information and belief, respectively reside in the City and County of Honolulu and Kauai County, Hawai'i.

4. Defendant Lee is and was at all relevant times a Hawaii-licensed general contractor of record for CK.

## JURISDICTION AND VENUE

5. There is complete diversity of citizenship between the parties and the amount in controversy herein exceeds $75,000.

6. This Court has jurisdiction over the parties and subject matter under 28 U.S.C. § 1332.

7. There is an actual controversy between Plaintiff, CK, Lee and Cornelio.

8. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to the claims at issue occurred within the District of Hawaiʻi.

## FACTUAL ALLEGATIONS

### The Project – Requirements and Scope of Contract

9. Plaintiff is the sole member of 4110 Wailapa Road LLC, a Hawaii limited liability company, which owns the property located at 4110 Wailapa Road, Kilauea, HI 96754 ("**Property**"). Plaintiff primarily uses the Property as an investment rental property.

10. Plaintiff earns rental income from the Property.

11. Plaintiff and Contractor entered into that certain contract dated May 26, 2025 (the "Contract"), under which Contractor had a number of responsibilities in regard to roofing work that was to take place on the Property, attached hereto as **Exhibit "1"**.

12. Specifically, the Contract required Contractor to install "Brava shake style roof shingles" to the three structures located on the Property (main house, guest house, and tennis court structures) (the "Project").

13. The Contract expressly includes the following obligations for the Contractor:

- Remove old existing shake shingle;
- Remove old existing batons;
- Remove old existing underlayment;
- Inspect sheeting;
- Remove old existing flashings;
- Install new copper drip edge flashing;
- Install new shark skin underlayment;
- Install new copper "w" valley flashing;
- Install new Brava shake style roof shingle;
- Install new lead pipe jacks;
- Install new Brava hi wind ridge caps; and
- Installation for the Brava shingles were to be for "higher wind rating using 1-3/4" stainless steel screws."

14. On April 1, 2026, Contractor executed a project completion document (the "Confirmation"), attached hereto as **Exhibit "2"**, warrantying to Plaintiff that certain requirements under Brava's provided installation guide ("Brava Installation Guide"), attached hereto as **Exhibit "3"**, had been met.

15. Requirements to meet Brava Installation Guide, which were represented as completed in the Confirmation, are as follows:

- Brava shake style roof shingles in natural cedar used throughout roof;
- Solid shake used at rakes and valleys;
- 10" exposure on shake lap;
- Stainless steel screws used on complete roof on, or appropriately adjacent to, fastener locator for highest wind rating;
- Markings made in white chalk and not red or blue chalk;
- All flashing installed using copper and fastened correctly;

- New lead pipe jacks used throughout;
- Brava hip and ridge caps used for hips and ridges;
- Starter used under first courses;
- Shark skin underlayment installed with minimum underlayment not less than 30lb felt;
- Eave overhang of ½”;
- Rake overhang of 1”;
- Screw penetration of at least ¾”;
- Two fasteners per full shake;
- All fasteners at least 1” in from edge of shake;
- Key-way spacing greater than 3/16” (typical 3/8”);
- Side lap spacing greater than 1½”; and
- No exposed fasteners.

**Project Issues – Poor Workmanship, Defective and/or Damaged Materials, and Incomplete Work**.

16. During the course of the Project, several issues arose that caused Plaintiff to begin to question quality of the workmanship and adherence to agreed-upon specifications.

17. Plaintiff resides in California, and as a result, could not physically monitor Contractor’s daily progress on the Project. However, from May 26, 2025, through April 1, 2026, Plaintiff received updates from the Property’s manager and other agents of Plaintiff, stating that certain deficiencies in the roof’s installation were becoming readily apparent.

18. Plaintiff engaged two roofing inspection companies to independently to perform inspections of the Property’s roof in order to determine satisfaction of both the Contract as well as the Brava Installation Guide’s requirements (“**Inspections**”).

19. The Inspections revealed that extent of the poor workmanship, defects, damaged materials, and incomplete work.

20. Contractor had failed to provide starter shingles in the necessary locations. Brava Installation Guide specifies a starter at the first course of shingle and at product transitions (such as crickets), which was not provided in certain critical locations upon the roof system, leaving the underlayment in such areas exposed.











(*note that some areas of the transition of roof to cricket area did have the necessary starter shingle, making apparent that the omission of the starter shingle on adjacent/nearby areas had been in error*)

21. The inspectors noted various issues with the fastening of the provided underlayment. Specifically, several areas where course shingles lap the roof cricket material are not properly fastened, leading to underlayment exposure (seen above).

22. In addition, there were multiple noted instances where underlayment was installed over shingles (see below), a blatant example of the poor workmanship wrought throughout the project.




23. Overdriven fasteners observed were noted at various locations (see below – overdriven screw that has pierce completely through the intended shingle and into the shingle below), which, per the Inspections, compromise the roofs integrity.



(*the picture on the left shows the intended fastener location has been pierced but no fastener remains in the intended location; the picture on the right, from the same location, shows that the fastener had penetrated to the shingle below*)

24. The Inspections revealed that abrasions could be easily observed at the modified bitumen material at the cricket to the right side of the home. The Inspections noted that these abrasions are significant enough to cause concerns of leaks early in the estimated lifespan of the roof system.



25. Poor workmanship was also noted in the plumbing vent flashing as sealant had been applied, which, per the Inspections, are atypical to such flashing installation. Further, the sealants used have leaked and stained the roofing on the Property.



26. Contractor also violated the express requirements of the Contract and Brava Installation Guide by using inadequate roof fasteners. The Contract specifically called for 1-3/4" stainless steel screws in order to achieve the high wind installation rating under the Brava Installation Guide; this was not done throughout the roof.

27. Inspections showed that the failure to provide the necessary high wind required screws were noted at the following locations on the map below: A1, A2, A3, A4, B2, B3, B4, B5, C1, C2, C3, C4, D1, D2, D3, D4, E1, F1, F4, G2, G3, H1, J1, L2, L3, M1, M2, M3, M4.






(*noted incorrect fastener – nails rather than screws – installation shown above*)

28. In any event, even these deficient fasteners display the poor workmanship of the Contractor as placement of the nails were at 60 to 70% higher than permitted under the Brava Installation Guide.

29. Such nailing deficiencies were not the exception but rather the rule, as none of the fasteners used were on the Brava specified nailing pads (note that the Brava Installation Guide also states that fasteners should “be no less than 1” from

the edge of the shake," which has also not been adhered to in many locations as displayed below).




30. Despite Contract requirements to replace roof flashings, damaged roof flashing at gable ends were not removed.




31. Additional poor workmanship was noted by the Inspections in the parapet flashing near the skylight box, which were not fastened to necessary wall. The Inspections note this as a wind hazard.




32. Further, Backer and Apron Saddle flashings (typically a brazed or soldered flashing that fits the top and bottom of skylights and hatch openings) were not supplied.




33. The Inspections also noted visible discoloring or tinting in multiple locations on the roof, likely due to spilled chalk used in chalk lines. In addition, the chalk used was against the express dictate of the Brava Installation Guide which prohibits the use of blue and red chalk in order to avoid discoloration or staining of the roof; Contractor clearly used red chalk (see images below).

 

34. Other discoloration noted on roof (near the right master bedroom), potentially due to rust.



35. Contractor also used ribbed ridge cap shakes at the bottom course at the hips, despite Brava Installation Guide suggesting solid shakes for the most natural aesthetic install method and provided express misrepresentations as to conformance to such recommendation in the Confirmation (see image below).






**<u>Remedial Work and Damage Mitigation</u>**

36. Due to the various construction defects noted above, proper remediation of the damage to the Property will require re-roofing work or a new roof altogether. A detailed breakdown of the remediation work includes:

a. **Demolition and Removals**: Removing and replacing Contractor work on the roof, and installation of new Brava shake roof tiles in accordance with the specified high wind installation standard.

1. Provide starter course near cricket areas.

2. Provide required screws per high wind installation criteria.

3. If reinstallation of roof tiles would be insufficient due to roof structure damage due to multiple faulty penetrations, a new roof will be required.

b. **Copper Flashing**:

1. Remove and replace copper flashing at Property’s gable areas.

2. Properly fasten parapet and eave flashing.

3. Provide and install Back and Apron Saddle flashing to skylight area.

**Notice of Construction Defect Provided**

37. On April 28, 2026, Plaintiff issued a notice of claim of construction defect ("**Notice**") to Contractor pursuant to HRS § 672E-3(a). A copy of the Notice is attached as **Exhibit "4"**.

38. The Notice detailed the extent of the poor workmanship on the Project and provided the opportunity to repair and remedy the issue before proceeding with this Complaint.

39. Having heard no response from Contractor to the Notice, on May 8, 2026, Plaintiff, once again sent the Notice to Contractor.

40. On May 26, 2026, Contractor contacted Plaintiff, through counsel, accepting the issues claimed in the Notice and noting willingness to conduct the necessary repairs to rectify the faulty workmanship, defective and/or damaged material, and incomplete work cited therein.

41. On June 4, 2026, Plaintiff confirmed that Contractor's May 26, 2026, offer was a formal offer to redress cited issues pursuant to the Right to Repair Act.

42. On July 8, 2026, via letter through Counsel, Plaintiff declined Contractor's offer due to Contractor's previous failures to provide the roof as contracted for between the parties and Contractor's subsequent misrepresentations

as to the completion of the Project as required by the Contract and to the Brava Installation Guide's standards.

43. In addition, upon information and belief, Contractor's proposed repairs were believed to likely be futile as the scope of the work required would render Contractor's envisioned repairs impracticable or impossible.

44. Plaintiff will be required to undertake extensive and expensive repairs to remedy the damages caused including the removal and proper reinstallation of new Brava shingles.

## COUNT I
## BREACH OF CONTRACT

45. Plaintiff repeats and incorporates by reference the allegations in each of the paragraphs above as if the same were fully set forth herein.

46. The Contract is valid, binding, and enforceable against Plaintiff and Contractor according to their respective terms.

47. There is an implied covenant of good faith and fair dealing in every contract governed by Hawaiʻi law.

48. CK and Lee are bound to the Contract entered into by Cornelio and Plaintiff because Cornelio, an apparently unlicensed contractor, held himself out as an agent of CK operating under CK and Lee's contractor's license and under CK's insurance policies.

49. Under Hawaiʻi law, an agency relationship may be created through actual or apparent authority of an agent to bind a principal to contract. The critical focus is not the principal and agent's intention to enter into an agency relationship, "but on whether a ***third party relies*** on the principal's conduct based on a reasonable belief in the existence of such a relationship." *Cho Mark Oriental Food v. K & K Int'l*, 73 Haw. 509, 516, 836 P.2d 1057, 1062 (1992) (emphasis added).

50. An agent, acting with apparent authority, can ultimately bind the principal to a contract, even though such agent does not have the actual authority from the principal to make such a contract. *Cosmopolitan Fin. Corp. v. Runnels*, 2 Haw. App. 33, 36, 625 P.2d 390, 394 (1981).

51. Cornelio, as a member of CK, had actual authority to bind CK to the obligations under the Contract with Plaintiff.

52. Contractor breached the Contract and the implied covenant of good faith and fair dealing by, among other things, failing to complete the work under the Contract with the quality and workmanship one would reasonably expect.

53. Contractor further failed to substantially complete the Contract as expressly required, which ultimately defeated the object and purpose of the Contract.

54. Plaintiff paid Contractor $338,776.91 under the Contract for work that must now be completely re-done.

55. Plaintiff's damages as a result of the breach include: the $335,432.91 already paid to Contractor; consequential damages to repair and remedy the defective work performed by Contractor; and damages from lost rental income that occurred while the Project affected the Property and that will likely occur while remediation efforts are undertaken.

**COUNT II**
**BREACH OF IMPLIED WARRANTY OF GOOD WORKMANSHIP**

56. Plaintiff repeats and incorporates by reference the allegations in each of the paragraphs above as if the same were fully set forth herein.

57. Under Hawaiʻi law, there is an implied warranty of good workmanship for work performed by licensed contractors.

58. The implied warranty of good workmanship provides a warranty that the licensed construction, repair, or modification of existing property will be workmanlike and conform to trade standards. Haw. Admin. Rules § 16-77-97.

59. The work performed did not conform to industry or trade standards.

60. In light of the poor workmanship, Contractor is liable to Plaintiff for a breach of the implied warranty of good workmanship.

**COUNT III**
**UNFAIR AND DECEPTIVE TRADE PRACTICES**

61. Plaintiff repeats and incorporates by reference the allegations in each of the paragraphs above as if the same were fully set forth herein.

62. Under Hawai`i law, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." HRS § 480-2(a).

63. In Hawai'i, licensed contractors are to explain verbally to homeowners all lien rights of the parties performing under a contract, the homeowner's option to demand bonding on the project, and all other relevant information pertaining to the contract and its performance. HRS § 444-25.5(a).

64. Following verbal disclosure, HRS § 444-25.5(b)(1) requires that within the written contract for the proposed work, contractors "performing home construction or improvements" are to expressly reaffirm contractor's lien rights required under § 444-25.5(a).

65. In addition, the written contract must include notice of the contractor's right to resolve any "alleged construction defects prior to commencing any litigation" pursuant to the Right to Repair Act. HRS § 444-25.5(b)(2).

66. Any contractor who fails to provide a written contract and notice to a homeowner of its prescribed rights is deemed to have engaged in unfair or deceptive trade practices under HRS § 480-2. HRS § 444-25.5(d) ("Any violation

of this section shall be deemed an unfair or deceptive practice and shall be subject to provisions of chapter 480, as well as the provisions of this chapter.”).

67. HRS § 481A-3(a)(2)-(3) provides that a person engages in a deceptive trade practice when, in the course of that person’s business, he “[c]auses likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services” or allows another to do the same.

68. Liability for unfair and deceptive trade practices under HRS Chapter 480 results in a ***mandatory award of treble damages***. HRS § 480-13(a)(1) (“plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorney’s fees together with the costs of suit[.]”).

69. Contractor violated HRS § 444-25.5 in failing to provide Plaintiff with the statutorily mandated verbal and written disclosures under the Contract. In breaching this duty under HRS § 444-25.5, Contractor necessarily violated HRS § 480-2.

70. Plaintiff is entitled to an award of treble damages and his reasonable attorneys’ fees for Defendants’ unfair and deceptive trade practices.

## COUNT IV
## NEGLIGENCE

71. Plaintiff repeats and incorporates by reference the allegations in each of the paragraphs above as if the same were fully set forth herein:

72. Under Hawai‘i law, Contractor and its agents have a common law duty of care and also have statutory duties to comply with HRS Chapters 444 and 480. These duties are distinct and separate from their duties under the Contract. *See Ass'n of Apartment Owners of Newtown Meadows v. Venture 15, Inc.*, 115 Hawai‘i 232, 295, 167 P.3d 225, 288 (2007).

73. Working under CK's contractor's license, Cornelio breached these duties and failed to comply with Hawai‘i law by failing to provide Plaintiff with adequate disclosures under HRS § 444-25.5.

74. Contractor acted negligently in the repairs of the Property's roof.

75. Contractor negligently misrepresented they had the necessary skills, experience, and abilities to perform the Project, including, but not limited to having completed the requisite training necessary to install the Brava roofing tiles contracted for.

76. Specifically, Cornelio negligently misrepresented that he had attained a Brava certificate indorsing him as a "certified installer" of Brava materials. Upon information and belief, Cornelio, at the time of the Project's purported completion, had NOT attained any such Brava Certificate.

77. Contractor negligently misrepresented Cornelio's licensing and certificate status or negligently permitted Cornelio to misrepresent such status.

78. Upon information and belief, despite Plaintiff request in their Notice of Construction Defect, Contractor negligently failed to tender notice of Plaintiff's claims to Contractor's insurance agent and carrier.

79. Contractor negligently misrepresented adherence to the Brava Installation Guide in the Confirmation, which had, in actuality, never been met.

80. As a direct and proximate result of Contractor's negligence and misrepresentations, Plaintiff has incurred considerable sums of damages and will incur more to remedy these negligent acts. *See, e.g.*, *Ass'n of Apartment Owners v. Venture 15, Inc.*, 115 Hawai'i 232, 295, 167 P.3d 225, 288 (2007) (citation omitted) ("A builder may be liable to a home buyer in tort despite the fact that the buyer suffered only "economic losses" where: (1) the builder has violated an applicable building code; (2) the builder has deviated from industry standards; or (3) the builder has constructed housing that he knows or should know will pose serious risks of physical harm.").

**NOW THEREFORE, PLAINTIFF ASKS THIS COURT FOR THE FOLLOWING RELIEF:**

A. A monetary judgment in favor of Plaintiff and against Defendants for damages in an amount to be proven at trial, which amount is not less than $75,000;

B. An award of pre-judgment interest and post-judgment interest at the statutory rate;

C. An award of Plaintiff's reasonable attorneys' fees and costs; and

D. Such other and further relief, legal, equitable, and/or declaratory as this Court may deem just and proper.

DATED: Honolulu, Hawaiʻi, October 30 2026.

DAMON KEY LEONG KUPCHAK HASTERT

*/s/ Toren K. Yamamoto*
GREGORY W. KUGLE
TOREN K. YAMAMOTO

Attorneys for Plaintiff
LUKASZ GOTTWALD